UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FIRST ANNEX, INC. | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 13-1368 (ESH) |
| NATIONAL RAILROAD PASSENGER CORP., *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

# MEMORANDUM OPINION

Plaintiff First Annex, Inc. brings this common law tort action against National Railroad Passenger Corporation, Washington Terminal Company, and Chicago Union Station Company (collectively "AMTRAK" or "defendants"), seeking damages for tortious interference with business relations and breach of contract. Defendants have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defs.' Mot. to Dismiss, Sept. 17, 2013 [ECF No. 3].) For the reasons stated herein, defendants' motion will be granted.

## BACKGROUND

Plaintiff is a restaurant and food service corporation licensed to do business in the District of Columbia. (Compl. ¶ 2.) On March 31, 2010, plaintiff executed a Lease Agreement with Union Station Investco, LLC ("USI") to lease space at Union Station in Washington, D.C., in order to open and operate an Einstein Bros. bagel and coffee shop franchise. (*Id.* ¶¶ 8, 10.) The Lease Agreement provided that the initial term of the ten-year lease would commence 120 days after the premises were made available by USI to plaintiff with USI's work on the premises "substantially completed." (*Id.* ¶ 11.) For the next 14 months, plaintiff prepared its construction

documents, submitted those documents to USI for review, and revised its plans in response to USI's comments. (*Id.* ¶¶ 13, 14, 15, 16, 17.) On May 13, 2011, USI notified plaintiff that it had substantially completed its work on the leased premises. (*Id.* ¶ 12.)

On August 19, 2011, USI approved plaintiff's construction documents, but also advised plaintiff for the first time that because its store would be located over the "AMTRAK Long-Haul Tunnel," its general contractor would have to "obtain clearance with AMTRAK . . . prior to performing any work in that location, specifically the plumbing drain and waste line installations." (*Id.* ¶ 19.) On September 6, 2011, plaintiff contacted AMTRAK about obtaining clearance, stating that it was "crucial [for plaintiff's contractors] to start doing these activities next week." (*Id.* ¶¶ 20-21.) On September 28, 2011, AMTRAK advised plaintiff that "any work on AMTRAK property must wait until a temporary permit to enter [TPE] upon AMTRAK property is issued. See attached procedure for applying. Turnaround time is generally 30 days but this can vary." (*Id.* ¶ 22.)

On June 1, 2012, USI sent plaintiff an invoice for rent in the amount of $334,267.45, which, according to the terms of the Lease Agreement, had started to accrue 120 days after USI gave notice of substantial completion. (*Id.* ¶ 26.) As plaintiff had not yet been issued the necessary TPE, plaintiff disputed the rent charge and the Lease Agreement was modified to provide that the obligation to pay rent commenced as of June 1, 2012. (*Id.* ¶ 27.) On October 9, 2012, AMTRAK issued the TPE plaintiff needed to proceed with construction. (*Id.* ¶ 23.) Plaintiff opened for business in March 2013. (*Id.* ¶ 28.)

On August 20, 2013, plaintiff filed a complaint in the Superior Court for the District of Columbia, alleging that AMTRAK's imposition of "unreasonable requirements and restrictions," "lack of cooperation," "neglect," "procrastination" and an "almost total lack of concern for

2

[plaintiff's] economic interests" resulted in "inordinate delay" in issuing the TPE (*id.* ¶¶ 23, 25) and meant that plaintiff "was not able to open for business until March 2013." (*Id.* ¶ 28.) As a result of these delays, the complaint alleges, plaintiff incurred "an obligation to pay base rental of $305,193.37 for the premises prior to the opening and commencement of business" (*id.* ¶ 28) and "lost nine months of revenue and profit." (*Id.* ¶ 29.) Plaintiff claims that defendants are liable for these damages (totaling "at least $1,010,000") because they (1) tortiously interfered with the Lease Agreement between plaintiff and USI (Count I) (*id.* ¶¶ 33-36); and (2) breached an "express or implied contractual relationship" with plaintiff (Count II) (*id.* ¶¶ 37-43). After removing the case to federal court (Notice of Removal, Sept. 10, 2013 [ECF No. 1]), defendants filed the pending motion to dismiss.

## ANALYSIS

### I. LEGAL STANDARD

Defendants argue that both counts of the complaint should be dismissed for failure to state a claim. *See* Fed. R. Civ P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "Although for the purposes of a motion to dismiss [a court] must take all of the

factual allegations in the complaint as true, [a court is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (internal quotation marks omitted)). Thus, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*

## II. TORTIOUS INTERFERENCE CLAIM

Plaintiff's claim for "tortious interference with business relations" is based on defendants' alleged interference with plaintiff's and USI's Lease Agreement. (Opp. at 3.) To state a claim for "intentional interference with business relations" under District of Columbia law, a complaint must plausibly allege: "(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *Onyeoziri v. Spivok*, 44 A.3d 279, 286 (D.C. 2012) (internal quotations omitted). "To be actionable, the interference need not cause an actual breach of the business relationship, but instead may cause merely a failure of performance by one of the parties." *Casco Marina Dev., L.L.C. v. District of Columbia Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003).

Defendants move to dismiss plaintiff's tortious interference with business relations claim on the ground that the complaint "is bereft of a single factual allegation of any intentional conduct on behalf of Amtrak which interfered with the Lease between USI and First Annex." (Defs.' Mot. to Dismiss at 7.) Plaintiff's opposition fails to address this point, and an examination of the complaint confirms that defendants' position is well-founded. On the issue of intent, the sole allegation in the complaint is that AMTRAK's "delays, neglect and procrastination were willful, intentional and done with knowledge that such actions and inactions would result in interference with performance of the Lease and that substantial economic

4

damages would result." (Compl. ¶ 36). This allegation, however, is nothing more than a legal conclusion which, as plaintiff acknowledges, the Court "need not accept." (Pl.'s Opp. at 3 (quoting *Hodges v. Gov't of District of Columbia*, 2013 WL 5427794, at *5 (D.D.C. Sept. 30, 2013) ("the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions").) Nor are there any factual allegations that allow the Court to draw the inference that AMTRAK delayed issuing the TPE or took actions that caused further delays in plaintiff's opening for business with the intent of interfering with plaintiff and USI's business relationship. Indeed, the complaint only alleges that these delays were the result of AMTRAK's "lack of cooperation," "neglect," "procrastination," and a "total lack of concern," (Compl. ¶¶ 23, 25, 28), a far cry from the intentional conduct required to state a claim for tortious interference with a business relationship. The only concrete factual allegation that arguably bears on the question of defendants' intent toward plaintiff is the allegation that another permit request was handled much more expeditiously. (*See id*. ¶¶ 30-32.) This allegation alone is not enough to move plaintiff's tortious interference claim across the line from possibility to plausibility. *See Iqbal*, 556 U.S. at 679 ("where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]' 'that the pleader is entitled to relief'").

### III. BREACH OF CONTRACT CLAIM

Plaintiff claims that defendants have breached one or more of the following contracts: (1) the October 9, 2012 "written agreement" between plaintiff and AMTRAK; (2) the Lease Agreement; or (3) an implied contractual relationship between plaintiff and AMTRAK. Defendant moves to dismiss on the ground that the complaint fails to allege facts supporting the

existence of either an express or implied contract between plaintiff and AMTRAK whose breach could have led to the alleged injuries. The Court agrees.

The October 9, 2012 "written agreement" is the TPE and although the complaint alleges that AMTRAK excessively delayed issuing the TPE, it does not allege any facts that would support a claim that AMTRAK breached the TPE or that its breach caused the injuries that plaintiff complains about. As for the Lease Agreement, plaintiff argues that AMTRAK should be considered a "party" to that express contract between it and USI by virtue of AMTRAK's "status" as "prime landlord of Union Station, Washington DC," its lease agreement with USI which allows USI to sub-lease space at Union Station, and because it is the "holder of subterranean easements." Plaintiff's argument is unsupported by any legal authority, and the Court is not persuaded that vague allegations in the complaint about contractual and other relationships between AMTRAK and USI or AMTRAK and Union Station or AMTRAK and the federal government are sufficient to render plaintiff's claim that AMTRAK is a party to the Lease Agreement plausible. *See Iqbal*, 556 at 679 ("Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.). Plaintiff's third theory is that there is an "implied contractual relationship" between plaintiff and AMTRAK and a corresponding "implied covenant of good faith and fair dealing" arising out of "the socialization of railway passenger transportation," which "has resulted in an intricate webs of ownership and control by a number of governmental, quasi-governmental and business entities linked by deeds, leases, easements, assignments of easements, assignments of leases, sub leases and sub sub leases and special legislation." (Pls.' Opp. at 4.) Again, the Court is unpersuaded that vague allegations about the nature of railroad transportation in the United States and the complexities of the legal

6

relationships surrounding the operation of Union Station are sufficient to plausibly allege an implied contract between plaintiff and AMTRAK.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss the complaint for failure to state a claim is granted. A separate Order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: October 23, 2013